463 N.W.2d 750 (1990)
LIBERTY MUTUAL INSURANCE COMPANY, Respondent,
v.
AMERICAN FAMILY MUTUAL INSURANCE COMPANY, et al., Petitioners, Appellants.
No. C3-89-277.
Supreme Court of Minnesota.
November 30, 1990.
*751 Mahoney, Dougherty & Mahoney, Kenneth Gleason, Minneapolis, for appellants.
Michael S. Kreidler, Minneapolis, for respondent.
Heard, considered, and decided by the court en banc.
COYNE, Justice.
On the petition of defendants American Family Mutual Insurance Company and Richard L. Anderson we review a decision of the court of appeals affirming summary declaratory judgment that Liberty Mutual Insurance Company is not obligated to provide either uninsured or underinsured motorist benefits pursuant to its policy issued to Richard L. Anderson. We reverse and remand.
On February 11, 1982 Anderson was injured in an accident on or near the I-494 bridge over the Mississippi River. His tractor-trailer jackknifed when he braked suddenly to avoid an unidentified vehicle which had swerved around Robert Ladd's stalled automobile.
*752 Anderson sued Ladd. The jury found that Anderson had sustained damages in the amount of $245,000 and apportioned fault 85% to Ladd and 15% to Anderson. The unidentified driver's fault was not submitted to the jury. Judgment for Anderson in the amount of $215,154.65 was entered on January 15, 1986.
American Family insured Ladd against liability to a limit of $100,000. The record does not disclose the extent of Anderson's efforts to prosecute his claim for benefits pursuant to the $300,000 uninsured motorist coverage and $300,000 underinsured motorist coverage afforded by his Liberty Mutual policy, but in a letter to Liberty Mutual dated October 30, 1985  just nine days after the verdict in Anderson's action against Ladd  Ladd's lawyer set out his theory that Liberty Mutual's exposure lay in its uninsured motorist coverage. Ladd's lawyer opined that Ladd was not actually underinsured because the bulk of the responsibility for the accident was attributable to a phantom vehicle deemed uninsured and that because Liberty Mutual's responsibility to its insured and its right of subrogation arose pursuant to uninsured motorist coverage, Liberty Mutual was not entitled to subrogation against Ladd. The writer gave it as his understanding that the matter could be settled by American Family paying $100,000 and Liberty Mutual paying $108,000[1] but that Liberty Mutual's representative had suggested the possibility of bringing a subrogation claim against Ladd. Ladd's counsel then outlined an alternative settlement plan which he and Anderson's counsel had discussed: American Family would pay the full amount of the judgment and Anderson would assign his claim for uninsured motorist coverage benefits, permitting American Family to pursue Anderson's claim against Liberty Mutual. The attempt to persuade Liberty Mutual to settle Anderson's uninsured/underinsured motorist coverage claim without recourse against Ladd concluded with this statement:
As a matter of general principle, American Family is not going to permit Mr. Ladd to be pursued on a subrogation claim when Liberty Mutual should provide the vast majority of the coverage on this case under uninsured motorist coverage, a coverage which would not permit subrogation.
The letter was forwarded to Liberty Mutual's lawyer, who responded that Liberty Mutual did not intend to pay any portion of the judgment against Ladd, that its policy contained standard subrogation provisions, and that in the event Liberty Mutual was required to pay uninsured or underinsured motorist benefits to Anderson, it would pursue its subrogation rights against Ladd.
Three months later, in a letter dated February 12, 1986 Anderson's lawyer notified Liberty Mutual that American Family had offered $230,000, and he inquired if Liberty Mutual wished to "substitute its check, so it can preserve its rights to proceed against the defendant."
In a March 5th letter addressed to both Anderson's and Ladd's lawyers, Liberty Mutual's lawyer replied:
Liberty Mutual Insurance Company has decided not to substitute its money in place of that offered by American Family Insurance Company. Liberty Mutual Insurance Company has decided not to preserve any potential subrogation rights against the defendant, Robert Ladd.
On the same day Anderson's lawyer wrote this letter to Liberty Mutual's lawyer:
As per our telephone conversation today, it is my understanding that you do not wish to substitute your check for American Family's payment of $230,000.00 which will satisfy the judgment against Ladd and purchase any rights Mr. Anderson may have to proceed in uninsured and underinsured coverage against your company.
I want to thank you for not using the full 30 days allowed you, and therefore my client will have his money a little earlier.
*753 Anderson then assigned his right and interest in the uninsured motorist and underinsured motorist coverages of his Liberty Mutual policy to American Family, reserving to himself a portion of any recovery in excess of $115,000 and agreeing to use his best efforts to obtain a maximum recovery. Anderson also executed a release of all claims arising out of the accident and a satisfaction of his judgment against Ladd.[2]
Subsequently, Anderson and American Family joined in a demand for arbitration of the claim for benefits pursuant to the uninsured and underinsured motorist coverages, an action which prompted the institution of this declaratory action seeking a determination that because Anderson had realized the full amount of his judgment, Liberty Mutual was not obligated to pay either uninsured or underinsured motorist benefits to Anderson or his assignee. Liberty Mutual moved for summary judgment contending that the assignment agreement was an invalid assignment of a personal injury claim and that Liberty Mutual did not have notice of the proposed settlement so that it could protect its right of subrogation. Following receipt of notice of the motion for summary judgment, American Family and Anderson recast their agreement in the form of a loan receipt agreement.
The trial court was persuaded that the payment which resulted in satisfaction of Anderson's judgment against Ladd, although in excess of Ladd's $100,000 policy limits, was unaccompanied by an agreement with regard to the overpayment and that the "renegotiation" of the transaction which resulted in the loan receipt agreement was without consideration and invalid.
The court of appeals affirmed on the ground that the assignment of Anderson's claim for uninsured motorist and underinsured motorist coverage benefits constituted the assignment, prohibited in Minnesota, of a cause of action for personal injury and that the loan receipt agreement was merely an attempt to achieve what was illegal in the first instance. The court of appeals also found that Liberty Mutual had not received adequate notice of a tentative settlement between Anderson and American Family.
The parties and the court of appeals treat this matter as governed by the principles articulated in Schmidt v. Clothier, 338 N.W.2d 256 (Minn.1983). The dynamics, however, of the settlement of a claim which has been reduced to judgment differ in significant respects from those of a settlement negotiated prior to trial. Much of the guesswork involved in an uninsured/underinsured motorist claim is eliminated by judgment against the tortfeasor. Thus, although the principles underlying the Schmidt decision are applicable in this analogous situation, the format for a settlement while preserving the insured's rights pursuant to uninsured and underinsured motorist coverages varies from that set out in the Schmidt case. The settlement proposed in the Schmidt case contemplated payment of the tortfeasor's liability policy limit in exchange for a full release. The decision in Schmidt was based on the legislative intention that underinsured motorist coverage should provide benefits in excess of the tortfeasor's liability limits and on the insured's "right to full control over the lawsuit against the tortfeasor, a control which would include the right to make the best settlement possible." Id. at 260. Recognizing, however, that the insurer's right of subrogation was also entitled to protection, this court held that the underinsured should be given written notice of the tentative settlement agreement and a period of thirty days in which to evaluate such factors as the amount of the settlement, the amount of liability insurance remaining, if any, and the extent of the tortfeasor's assets and to assess the comparative fault of the parties, the total of the insured's damages, the likelihood of the successful assertion of a subrogation claim, and the risks and expenses of litigation. Id. at 263. On the other hand, when the *754 insured has reduced his claim against the tortfeasor to judgment following a contested trial, whatever justification there may have been for delaying resolution of the uninsured/underinsured motorist claim no longer exists. The tortfeasor's liability to the insured, a jury's assessment of the insured's damages and the amount by which that assessment exceeds the limits of the tortfeasor's liability insurance have all been established, so that the insurer's options are basically limited to deciding whether it will attempt to negotiate a settlement based on the amount by which the insured's judgment exceeds the limits of the judgment debtor's insurance or whether it will insist on arbitration of the insured's claim pursuant to the uninsured/underinsured motorist coverage. In either event, of course, the insurer is entitled to a right of subrogation against the tortfeasor-judgment debtor.
In this case, however, having been advised of discussions between the insured's counsel and the judgment debtor's counsel regarding an alternative settlement plan, Liberty Mutual appears to have opted to do nothing, to simply await the outcome of the negotiations between its insured and American Family and the judgment debtor. One can, of course, speculate as does Liberty Mutual that American Family's concern that its insured not be subjected to a subrogation claim was prompted by the fear of a claim of bad faith, either already voiced or merely anticipated. But Liberty Mutual's conjecture regarding a bad faith charge does not relieve Liberty Mutual of its contractual obligation to its insured. Whether the judgment debtor's vehicle is an "underinsured motor vehicle", as that term is defined in Liberty Mutual's policy  "a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the accident but its limit for bodily injury liability is not enough to pay the full amount the covered person is legally entitled to recover as damages"  is tested by the limits of the tortfeasor/judgment debtor's liability coverage. The possibility that Ladd might assert a bad faith claim against American Family does not affect the rights of Liberty Mutual's insured in his uninsured/underinsured motorist coverage or permit Liberty Mutual to require its insured to pursue his claim for the amount of the judgment in excess of the limits of the debtor's insurance against the judgment debtor or the debtor's insurer before prosecuting his claim for uninsured/underinsured motorist coverage benefits.
The difference between pre- and post-judgment settlement dynamics and formats is, perhaps, more apparent when viewed from the perspective of the insured. Prior to trial of the action against the tortfeasor, the proposed settlement is designed to fix the liability of the tortfeasor and the tortfeasor's insurer, thereby expediting pursuit of the insured's claim pursuant to the uninsured/underinsured motorist coverage of the insured's automobile policy.[3] Inasmuch as settlement is achieved by release of all claims against the tortfeasor, the insured must proceed in accordance with the dictates of Schmidt v. Clothier in order to avoid breach of the insurance contract.
In contrast, after entry of judgment pursuant to a jury verdict, the insured is entitled to collect the amount of the judgment, up to the limits of the tortfeasor's liability insurance, from the tortfeasor's insurer  here, $100,000 from American Family. With respect to any unpaid balance of the judgment the insured has two options: (1) to pursue a claim for uninsured/underinsured motorist benefits provided by the insured's own insurance policy, or (2) to attempt collection of the balance of the judgment directly from the tortfeasor, a process which often entails the assignment by the tortfeasor of an alleged claim of bad faith on the part of the tortfeasor's insurer. While it is unusual for an insured judgment creditor to resort to the second alternative, an insured may have an interest in a post-judgment settlement designed to protect *755 the judgment from appeal.[4] If settlement is prompted by the desire to forestall an appeal, there would seem to be little to distinguish the proposed settlement from a settlement negotiated before trial. Regardless, however, of the finality of the insured's judgment, an insured who wishes to invoke uninsured/underinsured motorist coverage must respect the terms of the insurance contract.
Obviously, Anderson and American Family attempted compliance with Schmidt. Liberty Mutual complained, however, that it had not been given adequate notice of the proposed settlement with American Family, and a majority of the court of appeals agreed, holding that the earliest correspondence did not constitute "effective notice" because it did not communicate the existence of a "firm proposal." While it is probably true that American Family's letter of October 30th did not describe either a "tentative settlement" or a "firm proposal," the several items of correspondence between and among the parties, particularly the February 12th letter from Anderson's counsel and the March 5th letter from Liberty Mutual's counsel, strongly suggest that Liberty Mutual had received notice "`sufficient to apprise one of ordinary intelligence'" of the nature and subject matter of the transaction, Minneapolis v. Wurtele, 291 N.W.2d 386, 392 (Minn.1980), and that Liberty Mutual had actual notice of the proposed transaction and of the parties' readiness to proceed with the transaction. At best, the existence and adequacy of notice is a question of fact to be resolved by the finder of fact, not by the court of appeals.[5]
The relevance of notice becomes doubtful, however, when the structure of the settlement agreements is examined. Pursuant to the original settlement agreement American Family paid Anderson $230,000. For a stated consideration of $115,000 Anderson released Ladd and American Family from all claims, and Anderson attempted assignment to American Family of his right and interest in the uninsured motorist and underinsured motorist coverages of his Liberty Mutual policy for a further stated consideration of $115,000. In the assignment Anderson reserved to himself a portion of any recovery in excess of $115,000 and agreed to use his best efforts to obtain a maximum recovery. Anderson also delivered a satisfaction of the judgment against Ladd. If the documentation of the transaction between Anderson and American Family was rather unartful, it is nevertheless apparent that they were attempting to place American Family in a position to protect its insured from liability for damages in excess of his liability insurance coverage by assigning to it Anderson's claim for benefits pursuant to his uninsured/underinsured motorist coverage in consideration of the total sum of $230,000. While entitlement to benefits pursuant to uninsured or underinsured motorist coverage depends on the same proof as a cause of action for personal injury against an uninsured or underinsured tortfeasor, assignment of the insured's interest is not, as the lower courts concluded, the assignment of a cause of action for personal injury; it is the assignment of the insured's interest in an existing claim for benefits pursuant to a contract of insurance. Hence, the assignment was not an assignment prohibited by law; nevertheless, it did violate the policy provision prohibiting assignment of the insured's rights *756 pursuant to the policy absent the insurer's consent, which was neither sought nor given. We need not here decide whether the prohibition against assignment is enforceable in all circumstances. Suffice it to say that because assignment of the insured's interest in the uninsured/underinsured motorist coverages raises the same problems of champerty and maintenance that are present in the assignment of a personal injury claim, the policy prohibition against assignment can only be said to advance public policy.
The question then becomes whether the second settlement agreement between Anderson and American Family  the belatedly executed loan receipt agreement  is valid. In light of Anderson's inability to assign his interest in his Liberty Mutual policy, we see no reason why the parties could not rewrite their settlement agreement and recast it in the terms of a loan receipt agreement. Business Women's Holding Co. v. Farmers & Mechanics Savings Bank, 194 Minn. 171, 175, 259 N.W. 812, 813 (1935).
At this point the existence of a potential claim of bad faith on the part of the tortfeasor's insurer becomes relevant. The loan receipt provides that after settling Anderson's claim against Ladd for $100,000, American Family lent $130,000 to Anderson, which Anderson has no obligation to repay if his uninsured/underinsured motorist claim is unsuccessful. Liberty Mutual asserts that American Family was guilty of bad faith toward its insured. There is no evidence of bad faith in the record before us. We do not know what went on during the tort trial except that the verdict was disastrous for Ladd. Certainly, American Family satisfied its policy obligations when it paid its $100,000 policy limits, and it had no legal obligation to protect its insured against a subrogation claim by advancing an additional $130,000 on a loan receipt agreement unless, of course, American Family believed it was exposed to a bad faith claim by Ladd.
Under the circumstances, then, the consideration for the loan receipt agreement was Anderson's forbearance from obtaining an assignment of Ladd's bad faith claim against American Family and suing American Family on that assignment. In return, Anderson satisfied the tort judgment against Ladd, thus extinguishing the bad faith claim, and agreed to cooperate in the prosecution of his claim for uninsured/underinsured motorist benefits.
It is clear from the record that Liberty Mutual's position throughout the post-judgment maneuvering was that satisfaction by Anderson of his tort judgment against Ladd eliminated Anderson's claim against Liberty Mutual's uninsured/underinsured motorist coverage. In other words, Liberty Mutual assumed that satisfaction of the judgment amounted to full compensation for Anderson's injuries. This assumption also explains why Liberty Mutual never objected to Anderson's giving Ladd a full satisfaction of the entire judgment but was content to sit back while Anderson dealt with American Family.[6]
It is equally clear from both the original settlement and the loan receipt agreement that neither Anderson nor American Family intended the satisfaction of the judgment to be deemed an admission that Anderson had been fully compensated for his injuries; the right to maintain Anderson's uninsured/underinsured motorist claim was always expressly reserved. To put it another way, they intended to satisfy Ladd's tort liability to Anderson but not Liberty Mutual's liability on its uninsured/underinsured motorist coverage. Luxenburg v. Can-Tex Indus., 257 N.W.2d 804, 807-08 (Minn. 1977) (release of one tortfeasor does not release another if under the particular facts and circumstances intent not to release is evident and the claimant has not been fully compensated). See also Couillard v. Charles T. Miller Hospital, Inc., 253 Minn. 418, 424, 92 N.W.2d 96, 100 *757 (1958); Gronquist v. Olson, 242 Minn. 119, 126, 64 N.W.2d 159, 164 (1954).
Unfortunately, both insurers were wrong. Settlement and release of an underinsured tortfeasor does not  as Liberty Mutual concluded  necessarily preclude recovery of underinsured motorist coverage benefits. Schmidt v. Clothier, 338 N.W.2d 256, 263 (Minn.1983). On the other hand, when a tortfeasor and the tortfeasor's liability insurer willfully disregard notice of the subrogation claim of the injured person's insurer and enter into a separate settlement with the injured person, such a settlement does not  as American Family believed  defeat the subrogation rights of the injured person's insurer. Travelers Indemnity Co. v. Vaccari, 310 Minn. 97, 103, 245 N.W.2d 844, 848 (Minn. 1976). Although the latter principle is generally applicable only to a mature right of subrogation earned by previous payment of policy benefits, it seems to us equally applicable when the sole purpose of the settlement is to strip the injured person's insurer of its right of subrogation in order to shift the burden of the injured person's damages from a tortfeasor who has been adjudged liable for those damages to the injured person's insurer. Furthermore, since the injured person's insurer need not take any action to protect its acknowledged right of subrogation against destruction by such a settlement, whether that insurer receives advance notice of the proposed settlement is irrelevant.
If, then, Liberty Mutual's right of subrogation has not been extinguished by the loan receipt agreement and the satisfaction of the judgment against Ladd, the value, if any, of that right has yet to be determined. If American Family had paid Anderson its $100,000 policy limit plus interest and Liberty Mutual had paid Anderson uninsured/underinsured motorist coverage benefits in an amount equal to the unsatisfied portion of the judgment, to what extent could Liberty Mutual, as Anderson's assignee, have enforced the uninsured and unsatisfied portion of the judgment? Does Ladd own property against which execution could have been levied? If so, how much? Had Liberty Mutual attempted enforcement of a right of subrogation, could Ladd have forestalled levy of execution by assigning to Liberty Mutual a viable bad faith claim against American Family? The answers to these questions and, perhaps, some others are, we believe, necessary for a declaration of the respective rights and obligations of the parties pursuant to the insurance contract.
To the extent that Liberty Mutual's subrogation interest has been compromised, Anderson's uninsured/underinsured motorist coverage claim must fail. In any event, of course, Anderson's uninsured/underinsured motorist claim is limited to the amount by which his damages exceed the $100,000 limits of American Family's policy; but if, for example, it is demonstrated that Liberty Mutual could have obtained $50,000 in reimbursement from Ladd, any arbitration award to Anderson would be reduced not only by American Family's $100,000 policy limits but also by the additional $50,000 which could have been recovered from Ladd. If, indeed, Ladd had possessed a viable bad faith claim against American Family, the award would be subject to a $215,154.65 reduction  that is, the award would be reduced not only by American Family's policy limits but also by the value of Ladd's bad faith claim, an amount equal to the uninsured balance of the judgment against Ladd. If, on the other hand, Liberty Mutual was not prejudiced by satisfaction of the judgment against Ladd  if Ladd owns no property subject to levy of execution and if it cannot be shown that Ladd possessed an actionable bad faith claim against American Family  then Anderson may fully prosecute his uninsured/underinsured motorist claim to the extent that claim exceeds the limits of American Family. In other words, it is for the trial court to determine the extent to which the satisfaction of the judgment against Ladd has prejudiced Liberty Mutual's ability to secure reimbursement of sums for which it is obligated pursuant to its uninsured/underinsured motorist coverage.
*758 Finally, the court of appeals held that Anderson is collaterally estopped from asserting a claim pursuant to the uninsured motorist coverage because the comparative fault of the phantom driver was not submitted to the jury in the action against Ladd. This court has, however, ruled that an insured is entitled to arbitrate his uninsured motorist coverage claim even though a jury has already decided that the insured's comparative fault exceeds that of the tortfeasor. National Indemnity Co. v. Farm Bureau Mutual Ins. Co., 348 N.W.2d 748, 751-52 (Minn.1984); Milwaukee Mutual Ins. Co. v. Currier, 310 Minn. 81, 87-88, 245 N.W.2d 248, 251-52 (1976). The defense of res judicata does not preclude arbitration solely because the underlying claim would be barred by res judicata if asserted in an action in court. Ibid. See also Aufderhar v. Data Dispatch, Inc., 452 N.W.2d 648 (Minn.1990), and Johnson v. Consolidated Freightways, Inc., 420 N.W.2d 608 (Minn.1988). In this connection, however, we note that American Family's assumption that Liberty Mutual could not look to Ladd for reimbursement of any amount paid pursuant to its uninsured motorist coverage was erroneous. Anderson held a judgment on which Ladd alone was liable. Although Liberty Mutual's subrogation claim would have had to yield to Anderson's right to full compensation, Liberty Mutual would have been subrogated to the unsatisfied balance of the judgment.
Reversed and remanded to the trial court for further proceedings in accordance with this opinion.
TOMLJANOVICH, J., took no part in the consideration of this case.
NOTES
[1] Eighty-five percent (the portion of fault attributed to Ladd) of $245,000 (the total amount of Anderson's damages) equals $208,250.
[2] The satisfaction of judgment was filed on March 14, 1986, nine days after Liberty Mutual signified its intention not to preserve any right of subrogation against Ladd.
[3] Under certain limited circumstances, the insured's claim could fall within the uninsured motorist coverage despite the existence of some liability insurance.
[4] Since the insured's right to recover the full amount of the judgment has priority over the insurer's right of subrogation, it seems unlikely that the insured would pursue collection from the tortfeasor of his or her uninsured liability before asserting the uninsured/underinsured motorist claim even if the aggregate limits of the tortfeasor's liability insurance and the insured's underinsured motorist coverage are less than the amount of the judgment. Pfeffer v. State Auto & Cas. Underwriters, 292 N.W.2d 743 (Minn.1980).
[5] Although it seems to us doubtful that Liberty Mutual was misled, American Family demanded that Liberty Mutual substitute its check for $230,000 for American Family's check in that amount. It is unclear why American Family should expect Liberty Mutual to pay the $100,000 that American Family was already required to pay Anderson because of the judgment against Ladd.
[6] Liberty Mutual's policy requires its insured to do whatever is necessary to enable Liberty Mutual to exercise its right of subrogation and to refrain from doing anything to prejudice that right. From the beginning Liberty Mutual was on notice that Anderson would be giving Ladd a full satisfaction of the judgment; nevertheless, Liberty Mutual acquiesced in the satisfaction.